Whitney E. Street (State Bar No. 223870)
whitney@blockesq.com
BLOCK & LEVITON LLP
520 3rd Street, Suite 108
Oakland, CA 94607
(415) 968-8999
(617) 507-6020

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEVERLY YOUNGBLOOD, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BUMBLE BEE FOODS LLC, TRI-UNION SEAFOODS LLC, and STARKIST COMPANY,<br><br>Defendants. | Case No. **'15CV1863 JM   BLM**<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Beverly Youngblood by and through her attorneys, on behalf of herself and all others similarly situated, brings this Class Action Complaint ("Complaint") against Bumble Bee Foods LLC ("Bumble Bee"), Tri-Union Seafoods LLC ("Chicken of the Sea") and StarKist Company ("StarKist") (collectively, "Defendants") and alleges, based upon personal knowledge, information, belief, and the investigation of counsel, as follows:

**NATURE OF THE ACTION**

1. This lawsuit is a proposed class action to recover damages and other appropriate relief based on Defendants' unlawful conspiracy, from at least July 24, 2011 to the present (the "Class Period"), to fix raise, maintain and/or stabilize the price of packaged seafood products ("PSPs"). As set forth below, Defendants' conspiracy violates Sections 1 and 3 of the Sherman Act of 1890, 15 U.S.C. §§ 1, 3 ("Sherman Act").

# INTRODUCTION

2. This action arises out of a conspiracy by the three largest producers of PSPs (Bumble Bee, Chicken of the Sea and StarKist) to fix, raise, maintain and/or stabilize the price of PSPs. As used herein, the term PSPs refers to PSPs (predominately tuna fish) sold in cans, pouches or ready-to-eat serving packages.

3. On July 23, 2015, Thai Union Frozen Products (parent of Defendant Tri-Union, which produces the Chicken of the Sea brand) disclosed that it had received a grand jury subpoena from the Antitrust Division of the Department of Justice ("DOJ"). Subsequent news reports indicate that the other manufacturers also received similar grand jury subpoenas, indicating an investigation of the industry. In addition to the grand jury subpoenas, economic factors also support the conclusion that the market for PSPs was subject to manipulation during the relevant period.

4. As a result of Defendants' illegal conduct in restraint of competition, consumers, including Plaintiff and all members of the proposed Class, have been forced to pay supracompetitive prices for PSPs and thus have been harmed by Defendants' conduct.

# JURISDICTION AND VENUE

5. This complaint is filed under Sections 4 and 16 of the Clayton act, 15 U.S.C. §§ 15 and 26, to recover treble damages, equitable relief, costs of suit, and reasonable attorneys' fees for violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3. The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

6. Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. §1391(b), (c), and (d) because Defendants reside, transact business, are found within, and/or have agents within this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

7. This Court has personal jurisdiction over Defendants because, *inter alia*, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered PSPs in this District; (c) had substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## PARTIES

8. Plaintiff Beverly Youngblood is a resident of the State of Florida. During the Class Period, Plaintiff directly purchased PSPs from one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

9. Defendant Bumble Bee Foods LLC ("Bumble Bee") is a domestic corporation with its principal place of business located at 280 10th Avenue, San Diego, California 92101. Bumble Bee produces and sells PSPs throughout the United States (including in this District), its territories and the District of Columbia. Bumble Bee is privately owned by Lion Capital ("Lion), based in the United Kingdom.

10. Defendant Tri-Union Seafoods LLC is a domestic corporation with its principal place of business located at 9330 Scranton Road, Suite 500, San Diego, California 92121. Tri-Union Seafoods LLC produces and sells PSPs throughout the United States (including in this District), its territories and the District of Columbia, and markets these products under the brand name Chicken of the Sea. Unless otherwise indicated, Tri-Union Foods LLC will be referred to herein as "Chicken of the Sea." Chicken of the Sea is owned by Thai Union Frozen Products ("Thai Union"), a company based in Thailand.

11. Defendant StarKist Company ("StarKist") is a domestic corporation with its headquarters at 225 North Shore Drive, Suite 400, Pittsburgh, Pennsylvania 15212. StarKist produces and sells PSPs throughout the United Sates (including in this District), its territories and the District of Columbia. StarKist is privately owned by Dongwon Enterprise ("Dongwon"), a company based in South Korea.

## UNNAMED CO-CONSPIRATORS

12. On information and belief, at all relevant times, other producers of PSPs willingly conspired with Defendants in their unlawful restraint of trade. All averments herein against Defendants are also averred against these unnamed co-conspirators.

## AGENTS

13. The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## INTERSTATE TRADE AND COMMERCE

14. Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of PSPs in interstate commerce between and among offices of Defendants and their customers located throughout the United States, its territories and the District of Columbia.

15. Throughout the Class Period, Defendants transported substantial amounts of PSPs in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories and the District of Columbia.

16. Throughout the Class Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States, its territories and the District of Columbia.

## FACTUAL ALLEGATIONS

I. **PSPs**

17. Defendants sell PSPs to individuals, club warehouses, retail groceries, grocery cooperatives, mass merchandisers, and drug stores, among others.

18. The market for PSPs, including canned tuna, generated revenue of approximately $2.6 billion in 2014. Similarly, revenue generated from sales of PSPs was approximately $2.5 billion in 2012. A May 2012 presentation by Bumble Bee estimated 2011 revenue of $2.346 billion.

19. A large portion of revenue generated from sales of PSPs is attributable to sales of canned tuna. Bumble Bee has estimated that sales of canned tuna represent roughly 73% of revenue from sales of PSPs. Specifically, Bumble Bee estimated that total United States retail sales of shelf-stable tuna were $1.719 billion in 2011 and were estimated to be $1.750 billion in 2012.

## II. The Industry

20. Defendants are the three largest domestic manufacturers of PSPs. The industry is highly concentrated, with the three defendant manufacturers controlling approximately 75% of the market. Specifically, Bumble Bee reported the following market shares for the year 2011: Bumble Bee controlled 29% of the domestic market, StarKist controlled 25.3%, and Chicken of the Sea controlled 18.4%. The remaining market share was comprised of smaller companies and private label brands.

21. The aforementioned Bumble Bee presentation indicated that StarKist controlled 34.6% of the shelf-stable tuna market, Bumble Bee controlled 27.8% and Chicken of the Sea controlled 19.4%. In 2013, a UBS analyst reported the following market shares: 36% for StarKist, 25% for Bumble Bee and 20% for Chicken of the Sea. A December 2014 *Wall Street Journal* article reported that the Defendants' respective shares of the domestic market for canned tuna were 36% for StarKist, 25% for Bumble Bee and 13% for Chicken of the Sea.

22. Industry consolidation has resulted in an oligopolistic structure, with only three major producers controlling approximately 75% of the market of PSPs. The industry consolidated as follows:

- In 1997, Van Camp Seafood Company was acquired by the investment group Tri-Union Seafoods LLC, of which Thai Union was a member. Thai Union then acquired Van Camp completely and renamed it Chicken of the Sea International, an entity that was later merged into Tri-Union Seafoods LLC.
- In 2008, Dongwon acquired StarKist from Del Monte Foods for $363 million.

CLASS ACTION COMPLAINT

- In 2014, Thai Union bought Kind Oscar, a Norwegian sardine canner that sold 37% of its products in the United States.
- In December 2014, Thai Union announced that Lion would acquire Bumble Bee for $1.51 billion (subject to regulatory approval).

23. In December 2014, Thai Union Foods announced the proposed acquisition of its competitor Bumble Bee Foods LLC, which it planned to finance through a preferential public offering. The acquisition of Bumble Bee by Chicken of the Sea would have created a virtual duopoly, with the combined entity controlling nearly half of the market. As detailed below, that merger is presently on hold.

### III. The DOJ Investigation

24. On July 23, 2015, Thai Union suspended the preferential public offering in light of a grand jury investigation commenced by the Antitrust Division of the DOJ. On the same day, Thai Union disclosed that both Bumble Bee and Chicken of the Sea had received grand jury subpoenas relating to an antitrust investigation of PSPs.

25. In addition, the publication *Global Competition Review* reported an industry-wide investigation by the DOJ, rather than an investigation merely into the merger of Bumble Bee and Chicken of the Sea. Specifically, *Global Competition Review* reported:

> In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.
>
> He said the Thai Union subsidiary Tri-Union Seafoods, which operates in the US under the Chicken of the Sea brand, had received a subpoena "requiring Tri-Union to provide relevant information to the DOJ in relation to an antitrust investigation of the packaged seafood industry in the United States."
>
> ****
>
> An industry expert said the subpoena does not appear to be limited to the merger review, and early information indicates the demand for information came from a separate section of the antitrust division, not one tasked with analysing deals.
>
> It is highly likely that something produced in the merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal, he said.
>
> ****

The source said others in the industry are now anticipating that they too will be subpoenaed.

26. That Defendants received grand jury subpoenas is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's *Antitrust Division Manual*. Specifically, section F.1 of Chapter 3 notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division." *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.*

**IV.   The Conspiracy**

27. In addition to the grand jury subpoenas, economic factors support the conclusion that Defendants unlawfully manipulated the market for PSPs during the relevant period. For example, during this time period, input costs and demand were falling, yet prices continued to rise. These factors run counter to the basic laws of supply and demand and suggest that purchasers of these goods were overcharged by Defendants during the class period.

28. Consumption of PSPs, particularly consumption of canned tuna, has declined over the last ten years in the United States. The annual consumption per person was 3.1 lbs. in 2005, but had fallen to 2.3 lbs. in 2013. The National Marine Fisheries Service reported the following consumption trends for canned fish from 1984 to 2012:

**U.S. ANNUAL PER CAPITA CONSUMPTION OF CANNED FISHERY PRODUCTS, 1984-2012**

| Year | Salmon | Sardines | Tuna | Shellfish | Other | Total |
|------|--------|----------|------|-----------|-------|-------|
|      |        |          | Pounds |         |       |       |
| 1984 | 0.6 | 0.2 | 3.2 | 0.4 | 0.5 | 4.9 |
| 1985 | 0.5 | 0.3 | 3.3 | 0.5 | 0.4 | 5.0 |
| 1986 | 0.5 | 0.3 | 3.6 | 0.5 | 0.5 | 5.4 |
| 1987 | 0.4 | 0.3 | 3.5 | 0.5 | 0.5 | 5.2 |
| 1988 | 0.3 | 0.3 | 3.6 | 0.4 | 0.3 | 4.9 |
| 1989 | 0.3 | 0.3 | 3.9 | 0.4 | 0.2 | 5.1 |
| **1990** | **0.4** | **0.3** | **3.7** | **0.3** | **0.4** | **5.1** |
| 1991 | 0.5 | 0.2 | 3.6 | 0.4 | 0.2 | 4.9 |
| 1992 | 0.5 | 0.2 | 3.5 | 0.3 | 0.1 | 4.6 |
| 1993 | 0.4 | 0.2 | 3.5 | 0.3 | 0.1 | 4.5 |
| 1994 | 0.4 | 0.2 | 3.3 | 0.3 | 0.3 | 4.5 |
| 1995 | 0.5 | 0.2 | 3.4 | 0.3 | 0.3 | 4.7 |
| 1996 | 0.5 | 0.2 | 3.2 | 0.3 | 0.3 | 4.5 |
| 1997 | 0.4 | 0.2 | 3.1 | 0.3 | 0.4 | 4.4 |
| 1998 | 0.3 | 0.2 | 3.4 | 0.3 | 0.2 | 4.4 |
| 1999 | 0.3 | 0.2 | 3.5 | 0.4 | 0.3 | 4.7 |
| **2000** | **0.3** | **0.2** | **3.5** | **0.3** | **0.4** | **4.7** |
| 2001 | 0.4 | 0.2 | 2.9 | 0.3 | 0.4 | 4.2 |
| 2002 | 0.5 | 0.1 | 3.1 | 0.3 | 0.3 | 4.3 |
| 2003 | 0.4 | 0.1 | 3.4 | 0.4 | 0.3 | 4.6 |
| 2004 | 0.3 | 0.1 | 3.3 | 0.4 | 0.4 | 4.5 |
| 2005 | 0.4 | 0.1 | 3.1 | 0.4 | 0.3 | 4.3 |
| 2006 | 0.2 | 0.2 | 2.9 | 0.4 | 0.2 | 3.9 |
| 2007 | 0.3 | 0.2 | 2.7 | 0.4 | 0.3 | 3.9 |
| 2008 | 0.1 | 0.2 | 2.8 | 0.4 | 0.4 | 3.9 |
| 2009 | 0.2 | 0.2 | 2.5 | 0.4 | 0.4 | 3.7 |
| **2010** | **0.2** | **0.2** | **2.7** | **0.4** | **0.4** | **3.9** |
| 2011 | 0.2 | 0.2 | 2.6 | 0.4 | 0.4 | 3.8 |
| **2012** | **0.2** | **0.2** | **2.4** | **0.4** | **0.4** | **3.6** |

29. In the face of declining demand for a particular product, one would expect rational businesses to reduce the prices for that product. However, with respect to the PSPs market, Defendants defied economic expectations. The *Washington Post* reported on this phenomenon, noting that, while American consumption of PSPs is on the decline, prices for those products are on the rise.



30. Similarly, the Bureau of Labor Statistics calculated seasonally adjusted U.S. city average prices for shelf-stable fish and seafood from January 2005 through the first part of 2015, with the period 1982-84 used as a baseline.



31. As reported by Globefish.org:

> The US canned market continues declining as a result of weakening household demand. According to data presented during the INFOFISH TUNA 2014 conference by David Melbourne, the Senior Vice President of Bumble Bee Food, household intake of canned and pouch tuna in the US has declined. For the 52 weeks ending March 2014, consumption was reported at 65.9% compared with 68.1% recording during the same period of 2010. Sale volumes of shelf stable tuna during the reporting period also declined from USD 30.8 million (equivalent to 27.3 million cases), excluding sales in the catering sector. However, in value terms sales were stable at around USD 1.68 billion, reflecting the increase in canned tuna prices.

32. Raw material costs do not justify the increased prices for PSPs. While the cost per metric ton of skipjack tuna rose in 2012 and early 2013, it declined precipitously thereafter. *Undercurrent* reported on these low skipjack prices:



33. Specifically, according to the April 19, 2015 issue of *Tuna Market Intelligence*, "[a]s recently as June last year, skipjack was selling at US$1,800 in Bangkok. But the price has since plummeted to US$1,000 since the beginning of the year, with industry officials anticipating further reductions in price this year." The following month, United National Food & Agriculture Organization noted: "tuna prices declined significantly due to excess supply, with frozen skipjack prices hitting a 6-year low." With decreasing raw material costs and depressed demand, it would be economically rational for Defendants to decrease prices in an attempt to obtain more market share. Instead, Defendants acted irrationally and anticompetitively by raising prices.

34. Thai Union discussed the competitive landscape and pricing strategy in its annual reports. For example, in its 2013 Annual Report, Thai Union stated that "our branded tuna business shows resilient growth from 2012 thanks to the price adjustments in Europe and more rational market competition in the US." In the same report, Thai Union said that its future profit margins would depend upon "***[r]easonable US canned tuna competition without unnecessary price***." (Emphasis added).

35. Similarly, in its 2014 Annual Report, Thai Union noted that it had achieved its goal of "rational market competition." It explicitly stated:

> ***Thanks to reduced price competition (absence of cut throat pricing) and generally lower fish cost, our own tuna brands marked a great year of increase profitability***. Despite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped lift the margin of our US brand.
>
> ****
>
> Also, price adjustments and ***sensible market competition, supported by lower raw material costs***, made it possible for our own tuna brands to expand their margins through the year despite limited volume growth.

(Emphasis added).

36. Thai Union also indicated in its 2014 annual report that strong earnings and future revenue growth would depend upon whether Thai Union could ensure "[r]easonable US canned tuna market competition that focuses more on consumption creation than market share alone."

37. While raw material input costs and demand were decreasing, it would have been in the best interest of each Defendant to drop price to gain additional market share. Instead, Defendants colluded to achieve a "reasonable" and "sensible" level of competition through the "absence of cut throat pricing," to the detriment of the American consumer.

**Defendants' Opportunities to Collude**

38. Defendants had numerous business opportunities to meet and engage in price collusion, such as meetings for the Tuna Council. As explained on that organization's website:

> The National Fisheries Institute's Tuna Council represents the largest processors and household names for canned and pouch tuna in the U.S. including *Bumble Bee®, Chicken of the Sea® and StarKist®*. The Tuna Council speaks for the tuna industry on numerous issues including food safety, labeling, sustainability, nutrition education and product marketing.

39. Moreover, from 2011 to 2012, Defendants engaged in a joint advertising campaign referred to as "Tuna the Wonderfish." Joe Tuza, Senior Vice-President of Marketing for StarKist, reported that Defendants "worked together surprisingly well." He said further that the campaign, intended to increase consumption of tuna, was based on the hope that "as the water level rises...all boats rise with the tide," presumably referring to Defendants.

40. Defendants also work together via co-packing agreements which provide additional opportunities to collude. Specifically, Bumble Bee co-packs for Chicken of the Sea at its plant located in Santa Fe Springs, California with respect to West Coast sales. Chicken of the Sea does the same for Bumble Bee at its plant in Georgia with respect to East Coast sales. Thus, even before the proposed merger of Bumble Bee and Chicken of the Sea, the two companies were cooperating closely. These collaborative relationships provided Defendants with ample opportunity to collude on pricing.

**CLASS ACTION ALLEGATIONS**

41. Plaintiff brings this action on her own behalf and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Class"):

> All persons and entities that directly purchased PSPs within the United States, its territories and the District of Columbia from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between July 24, 2011 and the present. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

42. Plaintiff does not know the exact number of members of the Class because such information is in the exclusive control of Defendants. Due to the nature of the trade and commerce involved, however, Plaintiff believes that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States, its territories and the District of Columbia so that joinder of all Class members is impracticable.

43. There are questions of law and fact which are common to the claims of Plaintiff and the Class, including, but not limited to:

   a. Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for PSPs;

   b. Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for PSPs;

   c. The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for PSPs;

   d. Whether Defendants violated Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3;

   e. Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers,

employees, or representatives were activing within the scope of their authority and in furtherance of Defendants' business interest;

f. Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

g. Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Sections 1 and 3 of the Sherman Act.

44. Plaintiff's claims are typical of the claims of the members of the Class.

45. Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

46. Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

47. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

48. Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

b. The Class is readily definable and one for which records should exist in the files of Defendants.

c. Prosecution as a class action will eliminate the possibility of repetitious litigation.

d. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously,

efficiently, and without the duplication of effort and expense that numerous individual actions would require.

e. Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

49. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## COUNT I

**Violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)**

50. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

51. Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of PSPs within the United States, its territories, and the District of Columbia in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

52. Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and supracompetitive levels, the prices of such PSPs.

53. In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the price of PSPs.

54. The illegal combination and conspiracy alleged herein had the following effects, among others:

a. The prices charged by Defendants to, and paid by, Plaintiff and members of the Class for PSPs were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

  b. Plaintiff and members of the Class have been deprived of free and open competition in the purchase of PSPs;

  c. Plaintiff and members of the Class have been required to pay more for PSPs than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy; and

  d. Competition in the sale of PSPs has been restrained, suppressed, or eliminated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

A. That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B. That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act;

C. That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiff and the Class;

D. That the Court award Plaintiff and the Class treble damages;

E. That the Court award Plaintiff and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

F. That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or

adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

      G.    That the Court award Plaintiff and the Class such other and further relief as may be deemed necessary and appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff requests a jury trial on all matters so triable.

Dated: August 21, 2015

    BLOCK & LEVITON LLP

    By: /s/ *Whitney Street*
          Whitney Street

    BLOCK & LEVITON LLP
    Whitney E. Street
    (State Bar No. 223870)
    Lesley E. Weaver
    (State Bar No. 191305)
    520 3rd Street, Suite 108
    Oakland, CA 94607
    Telephone: (415) 968-8999
    Facsimile: (617) 507-6020
    wstreet@blockesq.com
    lweaver@blockesq.com

    Erica G. Langsen
    155 Federal Street, Suite 400
    Telephone: (617) 398-5600
    Facsimile: (617) 507-6020
    elangsen@blockesq,com

    *Counsel for Plaintiff*